# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2025

Lyle W. Cayce
Clerk

No. 24-20045

—————————

United States of America

*Plaintiff - Appellee*,

*versus*

Moctar Ahmadou Gouroudja Ahmadou,

*Defendant - Appellant*.

—————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CR-396-1

—————————————————————

Before Smith, Dennis, and Richman, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Moctar Ahmadou appeals his conviction and sentence for possession of a firearm as an alien admitted under a nonimmigrant visa in violation of 18 U.S.C. § 922(g)(5)(B). He asserts that the federally licensed firearms dealer misrepresented his eligibility to possess firearms and that he is therefore entitled to the defense of entrapment by estoppel. He further contends that the denial of an acceptance-of-responsibility reduction at sentencing was procedurally and substantively unreasonable. We disagree on each and affirm.

No. 24-20045

I.

According to the Presentence Report ("PSR"), Ahmadou entered the United States in 2016 from Niger under a nonimmigrant F1 visa to study at the North American University in Texas. (PSR ¶ 34). On May 21, 2020, Adam Alsahli, an Islamic extremist and supporter of ISIS, conducted an attack on the Naval Air Station Corpus Christi ("NASCC"). (PSR ¶ 6). A search of Alsahli's phone revealed that he had been in contact with Ahmadou before the attack. (PSR ¶¶ 7–14). Following the attack, the FBI launched an investigation into Ahmadou with the assistance of a confidential human source. (PSR ¶ 15).

In May 2021, Ahmadou visited the Texas Gun Club ("TGC"), where he rented and fired guns and took shooting courses. He completed a waiver of liability form that was created by TGC. That form contained a definition of "Prohibited Person" "as defined by The Gun Control Act of 1968." But the definition did not include § 922(g)(5)(B) (prohibiting possession by aliens admitted under nonimmigrant visa). Ahmadou checked the box stating, "I understand the definition of a 'Prohibited Person' as it pertains to possession of a firearm and swear and attest that I am in compliance with both federal and Texas State Law."

Undercover federal agents were present at the gun range when Ahmadou rented the firearms. TGC's manager testified that the agents were not "directing [him] on what to do that day"; "[t]hey told [him] business as usual." Following the investigation, Ahmadou was arrested, and he admitted in a custodial interview that his visits to the gun range were in preparation to commit jihad overseas if there was a need. (PSR ¶¶ 27–28). A search of Ahmadou's electronic devices revealed numerous ISIS propaganda videos, recordings, image files, and at least 100 videos depicting the beheadings of individuals by ISIS extremists. (PSR ¶ 33).

2

No. 24-20045

Ahmadou filed a *pro se* motion to dismiss the indictment in which he contended that he could satisfy the elements of the defense of entrapment by estoppel because he had been misled to believe that he was eligible to possess a firearm. The government filed a motion *in limine* asking the court to deny the motion to dismiss as unauthorized and to exclude any evidence regarding an entrapment-by-estoppel defense. At the pretrial conference, the court granted the motion *in limine* but stated that it would review caselaw presented by defense counsel in support of an entrapment-by-estoppel defense.

After jury *voir dire*, the court again considered the entrapment-by-estoppel defense and denied it, citing the absence of Fifth Circuit precedent. The court reserved its right to revisit that issue based on how "the evidence plays out in this particular presentation." At the end of the first day of trial, the court again considered the entrapment-by-estoppel defense and allowed Ahmadou to reconsider overnight whether he wished to proceed with the trial. On the beginning of the second day of trial, Ahmadou addressed the court and presented further arguments regarding the entrapment defense and indicated that he wished to proceed to trial. Before closing arguments, the court denied Ahmadou's proposed jury instruction regarding the entrapment defense.

The jury found Ahmadou guilty on all counts. The probation officer prepared the initial PSR, and Ahmadou filed several *pro se* objections, including an objection regarding a lack of a reduction for acceptance of responsibility. The government filed an objection to the lack of a 12-point terrorism enhancement under U.S.S.G. § 3A1.4. The final PSR included the terrorism enhancement. (PSR ¶¶ 45, 54).

At sentencing, the district court denied a reduction for acceptance of responsibility and declined to apply a 12-point terrorism enhancement under U.S.S.G. § 3A1.4. The court determined that Ahmadou's total offense level

3

was 22 with a criminal history category of I, resulting in a guideline range of 41 to 51 months. The district court determined that an above-guidelines sentence was appropriate and sentenced Ahmadou to 78 months of imprisonment as to Counts One and Two and 24 months as to Count Three, all terms to be served concurrently for a total of 78 months, and three concurrent three-year terms of supervised release.[1]

Ahmadou raises three issues on appeal: (1) the denial of the entrapment-by-estoppel defense, (2) the denial of a reduction for acceptance of responsibility, and (3) the procedural and substantive reasonableness of his sentence.

## II.

The court reviews exclusion of evidence for abuse of discretion. *United States v. Okulaja*, 21 F.4th 338, 344 (5th Cir. 2021). Abuse-of-discretion review likewise applies to the denial of a proposed jury instruction. *United States v. Hale*, 685 F.3d 522, 541 (5th Cir. 2012) (per curiam). And a "conviction cannot be overturned for failure to instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to acquittal." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996).

"We review the sentencing court's determination of acceptance of responsibility with even more deference than is due under a clearly erroneous standard because the sentencing judge is in a unique position to assess the defendant's acceptance of responsibility and true remorse." *United States v. Kidd*, 127 F.4th 982, 986 (5th Cir.) (cleaned up), *cert. denied*, 145 S. Ct. 2804

---

[1] The district court granted the government's motion to dismiss Count Four, which charged Ahmadou with possessing ammunition.

(2025).  Thus, the "court will affirm unless the district court's denial of a reduction is without foundation." *Id.* (cleaned up).

For Ahmadou's challenge to the reasonableness of his sentence, "[t]his court 'must first ensure that the district court committed no significant procedural error, such as . . . failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Rodriguez*, 136 F.4th 258, 269 (5th Cir. 2025) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).  If the sentence is procedurally sound, the court "'then consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" *Id.*

## III.
### A. Entrapment by Estoppel

Ahmadou asserts that the defense of entrapment by estoppel applies because the TGC waiver form's omission of the § 922(g)(5)(B) offense was an affirmative misrepresentation that he reasonably relied on when renting firearms.  Ahmadou contends that the district court erred by denying his motion to dismiss based on entrapment by estoppel, denying his request to assert that defense before and during the jury trial, and denying a jury instruction on that defense.

"The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996).  That defense was first articulated in *Raley v. Ohio*, 360 U.S. 423 (1959), and *Cox v. Louisiana*, 379 U.S. 559 (1965).  In *Raley*, the Court reversed convictions of failure to testify before a legislative commission because that commission had previously informed the defendants that the law did not require them to tes-

5

tify. The conviction was "an in-defensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *Raley*, 360 U.S. at 426. The Court applied *Raley* in *Cox*, where it reversed convictions of demonstrating near a courthouse because the highest police officials of the city, in the presence of the mayor and sheriff, had given defendants permission to demonstrate there. *Cox*, 379 U.S. at 569–71.

Entrapment by estoppel "is a narrow exception to the general rule that ignorance of the law is no excuse and is based on fundamental fairness concerns of the Due Process Clause." *Spires*, 79 F.3d at 466. "The focus of the inquiry is on the conduct of the government not the intent of the accused." *Id.* "To satisfy the requirements of the defense . . . , a defendant is required to show reliance either on a federal government official empowered to render the claimed erroneous advice, or on an authorized agent of the federal government who has been granted the authority from the federal government to render such advice." *Id.* at 466–67.

To succeed on his entrapment-by-estoppel claim, Ahmadou needs to clear two hurdles. He (1) must show that TGC actively assured him that his conduct was legal by affirmatively misrepresenting the law and (2) must establish that TGC (or its employees) are federal officials for purposes of the entrapment-by-estoppel defense. Ahmadou fails both requirements.

1. TGC did not affirmatively misrepresent the law to Ahmadou.

Ahmadou may invoke entrapment by estoppel only if the TGC "actively misle[d]" him by an "affirmative misrepresentation." *United States v. Trevino-Martinez*, 86 F.3d 65, 69 (5th Cir. 1996) (quotation omitted). The TGC likely did not make an affirmative misrepresentation to Ahmadou about his eligibility to possess a firearm, so the defense is inapplicable.

Entrapment by estoppel applies only when the government "actively

6

mislead[s] the defendant by inducing him to rely on an affirmative misrepresentation of the law by [the government official]." *Id.* (emphasis added).[2] In contrast, a mere failure to inform does not trigger the defense. *Id.* at 69–70.[3] Ahmadou asserts that TGC's waiver form affirmatively misrepresented his eligibility under § 922(g); the government counters that the form merely failed to inform Ahmadou of his ineligibility. The government has the better argument.

TGC presented Ahmadou with its waiver-of-liability form, which stated,

> Definition of 'Prohibited Person' as defined by The Gun Control Act of 1968 and codified at 18 USC 922
>
> "Prohibited Person" Defined: The Gun Control Act (GCA), codified at 18 U.S.C. § 922(g), prohibits the possession of a firearm by anyone…
>
> • convicted in any court of a [felony];
>
> • that is a fugitive from justice;
>
> • unlawfully using or addicted to any controlled substance. . . ;
>
> • adjudicated as a mental defective or has been committed to any mental institution;
>
> • an illegal alien;
>
> • who has been discharged from the Armed Forces under dishonorable conditions;
>
> • that has renounced his or her United States citizenship;

---

[2] *But see Cox*, 379 U.S. at 571 (characterizing *Raley* as holding that the defense applied because the defendants "relied upon assurances of the [state], either express or implied").

[3] *See also United States v. Cornejo-Flores*, 254 F.3d 1082 (5th Cir. 2001) (per curiam) (unpublished) (holding that failure to inform is not an affirmative representation).

> • subject to a court order restraining the person from harassing, stalking, or threatening . . . or convicted of a misdemeanor crime of domestic violence.

Ahmadou checked the form's box, stating "I understand the definition of a 'Prohibited Person' as it pertains to possession of a firearm and swear and attest that I am in compliance with both federal and Texas State Law."

Importantly, TGC's form omitted the § 922(g) offense of which Ahmadou was convicted: possession of a firearm by an alien admitted under a nonimmigrant visa. § 922(g)(5)(B). The government contends that that omission was "at most a mere failure to inform." Ahmadou insists that the "selective disclosure constitutes an affirmative misrepresentation."

The form is arguably misleading because it implies that the list of § 922(g) offenses is exhaustive. But there is a difference between a misleading omission and an affirmative misrepresentation.[4] The form merely implies—it does not affirmatively represent—that the listed categories are the only ones covered by § 922(g). Nor does the form state that nonimmigrant visa holders may legally possess firearms. TGC did not "actively assure[] [Ahmadou] that certain conduct is legal," so he cannot benefit from the entrapment-by-estoppel defense. *Spires*, 79 F.3d at 466.

Indeed, TGC did not "actively assure[]" Ahmadou that his conduct was legal because it made no "affirmative misrepresentation" about his eligibility to possess firearms. *Spires*, 79 F.3d at 466; *Trevino-Martinez*, 86 F.3d at 69. Thus, the entrapment-by-estoppel defense would not entitle Ahmadou

---

[4] This court has held that the entrapment by estoppel offense requires the latter. *Trevino-Martinez*, 86 F.3d at 69; *Spires*, 79 F.3d at 466. *But see Cox*, 379 U.S. at 571 (characterizing *Raley* as holding that the defense applied because the defendants "relied upon assurances of the [state], either express or implied"). On these facts, an incomplete form is an implication by silence rather than an affirmative misrepresentation.

to relief regardless of whether TGC could be considered a federal "official" or "agent." Even so, because this issue of "active assurance" is a closer one than the question of whether TGC is a federal official, we hold only that TGC is not a federal official, joining several of our sister circuits.

2. TGC is not a federal official for purposes of entrapment by estoppel.

The Fifth Circuit has "not [yet] decided whether a federally licensed firearms dealer is a federal official for purposes of the entrapment-by-estoppel defense." *Uresti-Careaga*, 281 F. App'x at 405. Ahmadou asserts that the defense of entrapment by estoppel "applies when a federally licensed firearm dealer, acting in coordination with a federal investigation, provides a defendant with a legal notice that excludes nonimmigrant visa holders from the list of individuals prohibited from renting firearms at a shooting range." This question has been addressed by other federal courts, including the Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits.[5]

The Ninth Circuit is the only circuit to hold that a federally licensed firearm dealer is a federal official. The defendant "received and possessed firearms in reliance upon the representation of a federally licensed gun dealer" that affirmatively misstated the law. *Tallmadge*, 829 F.2d at 774. The court reasoned that Congress has given licensees the "exclusive right" to sell firearms and that it concomitantly requires them to ask about purchasers' criminal backgrounds and to inform buyers about federal re-strictions on firearm purchases. *Id.* The majority concluded,

Clearly, the United States Government has made licensed fire-

---

[5] *United States v. Tallmadge*, 829 F.2d 767 (9th Cir. 1987); *United States v. Austin*, 915 F.2d 363 (8th Cir. 1990); *United States v. Billue*, 994 F.2d 1562 (11th Cir. 1993); *United States v. Howell*, 37 F.3d 1197 (7th Cir. 1994); *United States v. Hardridge*, 379 F.3d 1188 (10th Cir. 2004).

arms dealers federal agents in connection with the gathering and dispensing of information on the purchase of firearms. Under these circumstances, we believe that a buyer has the right to rely on the representations of a licensed firearms dealer[] who has been made aware of all the relevant historical facts . . . ."

*Id.*

The dissent criticized the majority for "allow[ing] individuals with only the most tenuous relationship to the government to bind it with respect to the interpretation and enforcement of the criminal laws." *Id.* at 777 (Kozinski, J., dissenting). A firearm dealer "is not even a federal employee, much less an official authorized to speak for the government." *Id.* "The idea that the holder of a government license can estop the government's enforcement of its penal laws has explosive potential." *Id.* at 779.[6]

Since *Tallmadge*, four other circuits have confronted the question, and all of them have sided with the *Tallmadge* dissent. In *Austin*, the Eighth Circuit emphasized that "[f]ederally licensed firearms dealers are private individuals." 915 F.2d at 366.

Despite the affirmative duty Congress has imposed upon federally licensed firearms dealers to enforce federal firearms laws at the point of sale, we cannot agree that this role, or their federal license to sell firearms, is sufficient to transform them into government officials, at least for purposes of the entrapment by estoppel defense.

*Id.* at 366–67 (citations omitted); *see also United States v. Hullette*, 525 F.3d 610 (8th Cir. 2008).

------

[6] As an example of such consequences, the dissent theorized that the majority's logic might "exonerate a minor who buys liquor illegally" if a store clerk makes a mistake. 829 F.2d at 799.

The Tenth Circuit followed suit in *Hardridge*. That court "distinguish[ed] between [the licensed dealer's] duty to comply with the law and an official responsibility to interpret the law, to see that the law is being properly administered, or to enforce the law." 379 F.3d at 1194. "Employees of a private business licensed by the government are a far cry from the high-ranking government officials" in the Supreme Court's entrapment-by-estoppel cases. *Id.* at 1193.

The *Hardridge* court also observed that "[t]he reason to distinguish between government officials and private persons is not the reasonableness of reliance." *Id.* at 1194. After all, it is often reasonable to rely on, *e.g.*, advice from an attorney that turns out to be mistaken. The due process rationale for the entrapment-by-estoppel defense is not the reliance itself, but the *identity* of the person on whom the defendant relied: the government cannot pull a surprise switcheroo by assuring a person that his conduct is legal in one breath and then prosecuting him for that conduct in the next. *See Raley*, 360 U.S. at 438. "To allow representations by firearms dealers to estop the government from prosecuting violations of the firearms law would be to give private individuals what amounts to a veto over enforcement of the criminal law." *Hardridge*, 379 F.3d at 1194. Finally, *Hardridge* explained that, in the context of firearms dealers, "the alleged unfairness to the defendant arises out of private conduct and not from government action," so "it is not the *government* that has denied due process." *Id.*

The Seventh and Eleventh Circuits have also adopted the majority rule. In *Billue*, the Eleventh Circuit held that "a federal license to sell firearms does not transform private licensees into government officials, thereby creating a potential entrapment by estoppel defense." 994 F.2d at 1569. And the Seventh Circuit likewise concluded that "the gun dealer . . . is a private individual; his license to sell firearms does not transform him into a government official." *Howell*, 37 F.3d at 1206.

11

No. 24-20045

We adopt the lopsided majority rule, that a licensed firearms dealer "is a private individual" rather than "a government official" for purposes of the entrapment-by-estoppel defense. *Id.* The Ninth Circuit is an outlier that "stretches the holdings of *Cox* and *Raley* too far." *Hardridge*, 379 F.3d at 1193. It "runs against the grain of decisions standing for the proposition that the holder of a government license does not act under color of state law for purposes of the equal protection clause." *Tallmadge*, 829 F.2d at 779 n.3 (Kozinski, J., dissenting).[7] Federal regulations of government contractors "do not convert the acts of entrepreneurs or of state governmental bodies into federal governmental acts." *United States v. Orleans*, 425 U.S. 807, 816 (1976) (interpreting a statutory waiver of sovereign immunity).

This court has recognized that the entrapment-by-estoppel defense is a "narrow exception to the general rule." *Spires*, 79 F.3d at 466. We therefore decline Ahmadou's invitation to stretch the Supreme Court's holdings in *Cox* and *Raley* beyond their bounds and against the persuasion of caselaw in this circuit.

### 3. TGC is not a *de facto* government agent.

Even if firearms dealers are not *per se* government agents, Ahmadou asserts that the facts of this case render TGC a government agent. But contrary to Ahmadou's contention, there are no facts that transform TGC into a *de facto* government agent.

Ahmadou relies almost exclusively on a post-*Tallmadge* Ninth Circuit case that he avers is factually similar. In *United States v. Batterjee*, that court held that the entrapment-by-estoppel defense applied where the defendant

---

[7] For example, a liquor license does not transform a private club's liquor sales into state action for Fourteenth Amendment purposes. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972).

on a nonimmigrant student visa relied on a federal form provided by a federally licensed firearms dealer. 361 F.3d 1210 (9th Cir. 2004). The firearms dealer in *Batterjee* presented the defendant with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Form 4473, which relayed the requirements of 922(g). *Id.* at 1213. But the "ATF did not update Form 4473 to reflect Congress's 1998" addition of the nonimmigrant visa exclusion until "nearly one year after Mr. Batterjee had purchased the pistol." *Id.* at 1215. When he illegally purchased the pistol, Batterjee relied on ATF's outdated form and the dealer employees' representation "that he would be eligible to purchase the pistol if he produced a government-issued photo identification and proof of residency." *Id.* at 1217–18.

Ahmadou's analogy to *Batterjee* fails for two reasons. First, the TGC waiver form was an internal document created by the firearms dealer—not the federal government. However plausible it might be that a licensee speaks as the government's agent when it adopts the *government*'s form, it is wholly implausible to estop the government when the private dealer creates its *own* form. Second, unlike *Batterjee*, Ahmadou does not point to any assurance by the gun dealer employees that he could legally possess a firearm.

Ahmadou also suggests that the presence of undercover federal agents at TGC renders the firearms dealer a government agent. In particular, he points to a federal agent's comment to TGC's manager to continue "business as usual." Ahmadou posits that "[w]hen federal agents direct a private entity to continue normal operations, knowing those operations including providing misleading information about firearm regulations, the government effectively authorizes and adopts that misinformation."

As an initial matter, Ahmadou does not point to any evidence that the federal agents knew what information was included in TGC's form. And Ahmadou takes the "business as usual" statement out of context to suggest

13

that the government was directing or controlling business operations. In fact, the trial transcript reveals that when the TGC manager was asked whether the federal agents were "directing you on what to do that day," he answered, "No. They told me business as usual." That hardly establishes federal control over TGC's operations. To the contrary, it suggests the officers' non-interference or non-direction over the TGC manager's behavior. In any event, the form Ahmadou signed was the TGC's usual waiver-of-liability document; TGC has everyone sign it who "comes in and wants to shoot on the range." So, the fact that TGC presented the form to Ahmadou had nothing to do with the federal surveillance. In sum, TGC acted neither as a government official nor as a government agent.

### B. Denial of reduction for acceptance of responsibility

Ahmadou avers that the district court erred by denying him a reduction in his sentence for acceptance of responsibility under U.S.S.G. § 3E1.1(a), which provides for a two-level decrease in the offense level "if the defendant clearly demonstrates acceptance of responsibility for his offense." Application Note 2 clarifies that

> [t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily

upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, cmt. n.2.

The government asked the court to deny the reduction for acceptance of responsibility because "the government was forced to produce [evidence] at trial. [The government] offered to have stipulations to certain portions, but he did not accept responsibility as to each and every element." The court agreed, replying, "Believe me, I remember very well."[8]

The district court acknowledged a post-conviction letter in which Ahmadou accepted responsibility, but it nonetheless concluded that Ahmadou was not entitled to the reduction: "[T]he Court tried this case and the Court remembers your stance about the charges in this case . . . And up until [trial] you were vehement that you were not responsible for this." (citing U.S.S.G. § 3E1.1, cmt. n.2).

Ahmadou contends that the court clearly erred because his case is one of the "rare circumstances" in which a defendant accepts responsibility but still goes to trial. In Ahmadou's telling, he did not challenge the factual elements of his offense but, instead, went to trial to assert a purely legal defense. Ahmadou points to a statement that the district court made mid-trial: "This is not the typical criminal case where facts are in dispute. I believe that the vast majority of what the government says factually happened the defense will agree to or not challenge and that this is more a legal position defense argument, which I've now, again, ruled upon." Ahmadou contends that the

---

[8] The pretrial conference transcripts and trial transcript do not reveal whether the government is correct in asserting that it offered to stipulate evidence. At one of the pretrial conferences, Ahmadou's counsel did note that Ahmadou "chooses to present [entrapment by estoppel] as his defense at trial, with full agreement that he did the facts, or 99 percent of the facts that the government is going to probably allege at trial."

entrapment-by-estoppel defense does not relate to his factual guilt.

The district court's denial is not "without foundation." *Kidd*, 127 F.4th at 987. First, although the pretrial conference transcripts and the trial transcript do not indicate whether the government offered to stipulate its evidence, Ahmadou's stance did force the government to put on witnesses to adduce evidence for each element of the offense. That suggests that, even if he did not falsely *deny* those elements, Ahmadou did not readily volunteer all of the conduct comprising the offense.[9]

More fundamentally, however, Ahmadou is mistaken that his entrapment-by-estoppel defense is unrelated to factual guilt. In *United States v. Sam*, this court explained that "'guilt', as used in the Guidelines commentary, is a broader term than 'offense.'" 467 F.3d 857, 863 (5th Cir. 2006). "'Guilty' is defined as 'justly liable to or deserving of a penalty,' and it is synonymous with 'blameworthy.'" *Id.* (citing WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 542 (1990)). Even if Ahmadou was forthcoming that he *committed* the offense, his entrapment-by-estoppel defense eschews his *responsibility*—i.e. his blameworthiness—for committing the offense. Ahmadou blames the *government* for his conduct by claiming that its agent misrepresented the law to him and that he relied on that representation.

Ahmadou leans on *Spires*'s holding that "the focus of the inquiry" in an entrapment-by-estoppel defense "is the conduct of the government not the intent of the accused." *Spires*, 79 F.3d at 466. That, says Ahmadou, differs from the entrapment defense because assertion of "an entrapment defense is a challenge to criminal intent and thus to culpability." *United States v. Brace*, 145 F.3d 247 (5th Cir. 1998) (en banc). But even though criminal

---

[9] *See* U.S.S.G. § 3E1.1, cmt. n.1(A) (distinguishing "truthfully admitting" from "falsely denying").

intent is not an element of entrapment by estoppel, that defense still hinges on the defendant's blameworthiness. The defense of entrapment by estoppel "is based on the fundamental fairness concerns of the Due Process Clause." *Spires*, 79 F.3d at 466. In other words, the essence of the defense is that it is not blameworthy where a defendant engages in conduct that the government has assured him it will not punish.

The district court did not clearly err in denying Ahmadou a reduction for acceptance of responsibility under U.S.S.G. §3E1.1.

### C. Procedural and substantive reasonableness

Ahmadou challenges his sentence as procedurally and substantively unreasonable. He asserts that the district court "erred in imposing an upward departure or variance under U.S.S.G. § 3A1.4, Application Note 4 by relying on protected speech, religion, and association without making specific factual findings."

The court declined to apply the terrorism enhancement of § 3A1.4 because the government had not shown that Ahmadou's offense "involved, or was intended to promote, a federal crime of terrorism." § 3A1.4.[10] The court found that the evidence did not demonstrate that Ahmadou's firearm offense was intended to promote terrorism, nor that he joined a group that promoted terrorism.

Nonetheless, the court still imposed an above-guidelines sentence. At the sentencing hearing, it orally pronounced the reasons:

> The Court was made aware early on that part of the subtext of
> this case was the associations that this defendant had with a

---

[10] U.S.S.G. § 3A1.4 provides for a 12-level guidelines enhancement and a minimum resulting offense level of 32.

known terrorist. . . .

This defendant was here on a student visa . . . The Court takes issue with the defendant claiming not to have known that he could possess firearms. It is clearly stated as part of the visa requirements . . . So from the Court's point of view, you knew that you should not have possessed firearms or handled firearms.

The Court has held the government to task on seeking an enhancement for terrorism; and as the Court pointed out, it did not believe the government had met its burden of proof to get there. Now the Court undertakes that same evidence for purpose of enhancement, and it is clear that this defendant viewed some of the most reprehensible and vile subject matter available to a person with access to a computer.

While you may not have donated money or participated in the creation of those videos, you did provide a click to those videos. You provided an audience for those videos, and the only reason that those videos are created is for an audience. Without an audience they become useless. I understand that you've told the Court of your curiosity as you were wading through your religious understanding and religious training to come to some understanding as to what your religion required of you; but along the way you took missteps, specifically in repeatedly observing those videos. Someone who claims to be a person of God seeing someone killed on video or having their head chopped off, I think you only need to see it once, not repeatedly, to understand that that's not part of any religion of love or faith, yet you went back time and time again to view it.

All of these factors taken in context suggest to the Court that up [*sic*] upward departure is appropriate in this case. . . .

The Court, having heard now the defendant stand before it and read the letter provided about his acceptance of responsibility and his remorse here today, I do take that into consideration. The Court again is wholly unsatisfied that a foreign student

No. 24-20045

came into our country under a student visa . . . and violated that
trust.

The Court is disturbed by the videos that you watched and
despite your reasoning for it, there was no redeeming reason
for you to repeatedly watch those videos. While the Court is
troubled by your association with someone who did, in fact,
commit terrorism on these shores and your expressed interest
in jihad, whatever that may have been formed in your mind to
look like, the Court is troubled by it. And again these are the
reasons and factors the Court has considered for purposes of
its upward departure.

Then, in its written statement of reasons, the court stated that the
above-guidelines sentence was a variance per 18 U.S.C. § 3553(a)—not an
upward departure. At the oral pronouncement, it summarized the reasons:

The Court has a long history with the case and was made aware
early on about the subtext to terrorism. Although the Court
held the Government to the text on the terrorism enhance-
ment, it was clear the defendant viewed reprehensible and vile
subject matter related to terrorism repeatedly under the guise
of religious curiosity. Although the defendant did not contrib-
ute money to terrorist organizations, he did provide an audi-
ence and a "click" in support of the terrorist organizations.
The Court found the defendant violated the United States'
trust and took issue with the defendant's position that he did
not know he could not possess a firearm. The Court was fur-
ther troubled by the defendant's association with the person
who did commit terrorism.

### 1. Ahmadou's sentence is procedurally reasonable.

Ahmadou contends the sentence is procedurally unreasonable be-
cause the district court applied an upward departure under § 3A1.4, Appli-
cation Note 4, without explaining which departure provision of Note 4
applied and without making factual findings to support either provision.

19

No. 24-20045

Ahmadou also alleges procedural error in the "inconsistency" between the oral pronouncement's use of the term "departure" and the written statement of reasons' declaration that the sentence is an upward variance per § 3553(a).

"Our court recognizes three types of reasonable sentences: (1) a sentence within the guidelines range; (2) a departure based on the guidelines; and (3) a non-guidelines sentence or variance based on the § 3553(a) factors." *United States v. Lavalais*, 960 F.3d 180, 189 (5th Cir. 2020).

The record establishes that the sentence was an upward variance per § 3553(a)—not an upward departure under § 3A1.4, Application Note 4. Although the court used the term "departure" in its oral pronouncement, the context indicates that it did so in reference to a § 3553(a) variance—not a departure under the guidelines.

The court never said that it was applying Application Note 4. The oral pronouncement elucidated factors relevant to § 3553(a), and the reasons the court gave for denying the § 3A1.4 adjustment for terrorism indicate that it did not depart under Note 4. Note 4 applies when the terrorism adjustment would otherwise apply but either

> (1) the offense of conviction was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" but it promoted an offense other than those enumerated in the guideline cross-reference; or
>
> (2) the terrorism was against civilians rather than a government.

*See* § 3A1.4, cmt. n.4. The court made no findings as to either prong. And its finding—that the evidence did not establish that Ahmadou's offense was intended to promote terrorism—further indicates that the court was not departing under Note 4. Indeed, the court clarified, near the end of the sen-

20

tencing hearing, that "[t]here was no punishment included whatsoever for terrorism in the Court's pronouncement."

The written statement of reasons confirms that the above-guidelines sentence was a § 3553(a) variance.[11] The written statement recapitulates the same reasons the court cited in the oral pronouncement, and its denomination of the sentence as a § 3553(a) variance resolves any ambiguity in the oral pronouncement.[12]

Thus, there was no procedural error. To the extent that any concerns remain, any procedural error would also have been harmless.[13] The government has the burden to show that sentencing error was harmless by "establish[ing] beyond a reasonable doubt that the district court would have imposed the same sentence absent the error." *United States v. Mejia-Huerta*, 480 F.3d 713, 720 (5th Cir. 2007). Here, it has met that burden because the written statement of reasons confirms that the district court would have imposed the same sentence for the same reasons under § 3553(a).[14]

2. Ahmadou's sentence is substantively reasonable.

Ahmadou asserts that his above-guidelines sentence is substantively

---

[11] *See United States v. Jones*, 75 F.4th 502, 512 (5th Cir. 2023) (considering written statement of reasons in procedural reasonableness challenge).

[12] *Cf. United States v. Johnson*, No. 22-30386, 2023 WL 116722, at *1 (5th Cir. 2023) (per curiam) (unpublished) (where defendant claimed district court failed to clarify whether sentence was departure or variance, but record established sentence was a variance).

[13] *See United States v. McNeal*, 102 F.4th 708, 710 (5th Cir. 2024) (holding that harmless-error analysis applies to procedural reasonableness challenges).

[14] *See id.* (cleaned up) ("We need not consider the propriety of a sentence as an upward departure because the sentence may be affirmed on the court's alternate basis as an upward variance justified by the 18 U.S.C. § 3553(a) sentencing factors.").

unreasonable—whether it's a departure or a variance—because the district court's reasons "implicat[e] First Amendment protections for speech, association, and religion."

As an initial matter, the court did not punish Ahmadou for his religion. Instead, it found that Ahmadou's stated reason for watching the jihad beheading videos—religious curiosity—was pretextual. The court explained that the defendant's *repeatedly* watching the beheading and killing videos undermined the veracity of his claim that he was merely discerning the requirements of his religion. And that repeated viewing provided an audience and a "click" for the terrorist videos.[15]

To the extent that the district court's reasons implicated protected First Amendment beliefs, expression, and association, that does not necessarily invalidate them. "[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Delaware v. Dawson*, 503 U.S. 159, 165 (1992). Admission of such evidence does not violate the Constitution if it is relevant to the issues at sentencing. *Id.* at 165–67.[16] For example, "associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.* at 166.

---

[15] Nor is it clear that the jihad killing videos are protected speech under the First Amendment—to maintain that they are so protected, and to maintain that they are necessary for Ahmadou to appreciate his own faith, stretches credulity.

[16] *See Boyle v. Johnson*, 93 F.3d 180, 183 (5th Cir. 1996) (applying *Dawson* and holding that the evidence "must be sufficiently related to the issues involved"); *United States v. Simkanin*, 420 F.3d 397, 417 (5th Cir. 2005) (quotation omitted) (holding that defendant's "beliefs and associations may be considered if they were sufficiently related to the issues at sentencing").

No. 24-20045

Ahmadou's interest in jihad was reasonable for the district court to consider in the context of his firearm offense.  Even though the court did not find that the firearm offense was itself intended to promote terrorism, that does not render *irrelevant* at sentencing Ahmadou's obsessive viewing of beheading videos and his association with someone who committed terrorism.  The court's consideration of Ahmadou's disturbing preoccupation with jihad is not constitutionally forbidden because obsession with violent terrorism is relevant context to his possession of a violent weapon.[17]  Ahmadou's sentence is substantively reasonable and does not violate the Constitution.

The judgment of conviction and sentence is AFFIRMED.

_____

[17] *See* § 3553(a)(1) (stating that the district court "shall consider" "the nature and circumstances of the offense and the history and characteristics of the defendant").

No. 24-20045

JAMES L. DENNIS, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that the district court did not err by denying Moctar Ahmadou the defense of entrapment-by-estoppel or by denying him an acceptance-of-responsibility offense level reduction under U.S.S.G. § 3E1.1. But I respectfully disagree that the district court's above-Guidelines sentence represented a procedurally proper Guideline variance. The court orally imposed an "upward *departure*" on terrorism-related facts while the Statement of Reasons rebranded the same rationale as a § 3553(a) "*variance*." The record does not rectify this ambiguity. Moreover, under either reading there is procedural error—the district court either improperly departed from the Guidelines without issuing § 3A1.4 Application Note 4 findings, or it varied without an adequate § 3553(a) explanation—and the Government has not met its beyond-a-reasonable-doubt harmless error burden. Because I would vacate Ahmadou's sentence and remand for resentencing, I respectfully concur in part and dissent in part.

\* \* \*

Ahmadou correctly contends that any meaningful appellate review here "is complicated by variations between the court's oral pronouncement of an upward departure and its Statement of Reasons articulating an upward variance." Where there is ambiguity between the oral pronouncement and the written judgment, we examine the whole record to discern the district court's intent. *United States v. Garza*, 448 F.3d 294, 302 (5th Cir. 2006) (citing *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001)). The majority reads this record as a straightforward § 3553(a) variance rather than a departure under U.S.S.G. § 3A1.4, Application Note 4. *See ante*, at 20–21. I disagree.

The PSR recommended applying a twelve-level terrorism enhancement under § 3A1.4(a); Ahmadou objected. The PSR also advised

24

that, "should the Court find the enhancement . . . does not apply," "factor(s) which may warrant departure" existed under Application Note 4:

> Due to the nature and circumstances of the offense and the defendant's involvement with an individual known to have committed a terroristic act in the United States, as well as the defendant's significant indoctrination with ISIS-related propaganda and the seeking of jihad, an upward departure may be warranted.

Following argument on Ahmadou's objection to the § 3A1.4(a) enhancement at the sentencing hearing, the Government and the district court canvassed alternatives to applying the enhancement, including departures and variances:

> MR. SCHAMMEL: I'm sorry. One other thing. In some instances, both in domestic terrorism cases and in international terrorism cases what we've seen is sometimes the judge or the court will apply the terrorist enhancement and upwardly depart, but then using 3553 factors, if the court thinks the 12-level enhancement is too much and Category 6 is too much, downwardly vary.
>
> THE COURT: That's an excellent point, and I had just arrived at that conclusion.
>
> MR. SCHAMMEL: Thank you.
>
> THE COURT: *The converse of that is I could sustain the objection and upwardly depart based upon what you've outlined as the evidence in this case based upon the recommended sentencing guideline*, could I not?
>
> MR. SCHAMMEL: Yes, Your Honor.

The district court then sustained Ahmadou's objection to § 3A1.4(a). The Government again urged that Application Note 4 "provides for an upward departure," grounding that request in the same terrorism-related facts the

No. 24-20045

PSR had flagged: Ahmadou's consumption of ISIS propaganda and associations with Adam Alsahli, an ISIS terrorist.

Over Ahmadou's objection, the district court determined "an *upward departure* [was] appropriate" based upon the "same evidence" of Ahmadou's association with terrorism urged by the Government to support the § 3A1.4(a) enhancement:

> ***The Court has held the government to task on seeking an enhancement for terrorism***; and as the Court pointed out, it did not believe the government had met its burden of proof to get there. ***Now the Court undertakes that same evidence for purpose of enhancement***, and it is clear that this defendant viewed some of the most reprehensible and vile subject matter available to a person with access to a computer. . . .

The court likewise was "troubled by [Ahmadou's] association with someone who did, in fact, commit terrorism on these shores and [his] expressed interest in jihad[.]" "All of these factors taken in context," the district court reasoned, "suggest to the Court that [an] upward departure is appropriate in this case."

Lest there be any doubt, the court would reiterate that its above-Guidelines sentence of Ahmadou represented an "upward departure" three more times. At no point did the court invoke "variance," § 3553(a), or its factors. That only materialized in the Statement of Reasons, where the court newly characterized its above-Guidelines "departure" as a "variance" under § 3553(a)(1), which conveniently depended upon the same terrorism-related evidence proffered by the Government.

Relying on what it calls "context," the majority concludes Ahmadou's sentence was an upward variance under § 3553(a), rather than the district court's self-described "departure" under § 3A1.4, Application Note 4. *Ante*, at 20. But what the majority calls context is really inference

piled on silence. The actual context—the PSR's recommendation, the Government's request, and the court's own colloquy—shows that the oral pronouncement was a departure, not a § 3553(a) variance. Put plainly, the district court did exactly what it said it would: "sustain the objection [to the terrorism enhancement] and *upwardly depart* based upon what [the Government] outlined as the evidence in this case based upon the recommended sentencing guideline[.]" That the court "never said that it was applying Application Note 4," *ante*, at 20, is beside the point. It invoked "departure" and relied on the same terrorism-related facts the PSR and Government identified as grounds for Application Note 4. The only fair reading of the court's sentence is an above-Guidelines departure, and the only departure ever discussed was that of § 3A1.4, Application Note 4.

Moreover, the majority's emphasis on the district court's silence is equally true of § 3553(a). The district court's Statement of Reasons purports to justify the "variance" under § 3553(a)(1), *i.e.*, "the nature and circumstances of the offense and the history and characteristics of the defendant," but the court conspicuously omitted referencing that *sole* factor in its pronouncement. True, a sentencing court need not recite "robotic incantations" of each factor. *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) (citation omitted). But the omission of § 3553(a)(1) here does not clarify; it compounds the ambiguity between the court's oral "departure" and written "variance." Nor does the majority's fallback—that the Statement of Reasons merely "recapitulates the same reasons" offered orally—solve the problem. *Ante*, at 21. Reciting the same facts in both its oral and written sentence does nothing to resolve whether the court intended to upwardly depart or vary. For example, the court reassured Ahmadou that "there was no punishment included whatsoever for terrorism" in its pronouncement, yet it grounded its "upward departure" in the very

terrorism-related conduct the PSR and Government advanced to support Application Note 4. This mismatch frustrates meaningful review.

That leaves two paths, and both are procedurally unreasonable. If the district court intended to upwardly depart under Application Note 4, the majority concedes that it "made no findings" sufficient to do so. *Ante*, at 20. If the court instead meant to vary under § 3553(a), it failed to articulate reasons adequate to support that choice, much less the extent of the increase. The Statement of Reasons invokes § 3553(a)(1) and says the court was "troubled" by Ahmadou's repeated viewing of "reprehensible and vile" ISIS propaganda "under the guise of religious curiosity" and his "association" with Alsahli. But sentencing cannot turn on bare disapproval of beliefs or associations; such evidence must be "sufficiently related to the issues at sentencing," such as demonstrating future dangerousness or a likelihood of recidivism—considerations that map to § 3553(a). *Boyle v. Johnson*, 93 F.3d 180, 183–84 (5th Cir. 1996) (quoting *Dawson v. Delaware*, 503 U.S. 159, 165 (1992)); *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997); *United States v. Simkanin*, 420 F.3d 397, 417 (5th Cir. 2005); *see also* 18 U.S.C. § 3553(a)(2)(B)–(C).

Here, the court never drew that line. It did not explain how Ahmadou's viewing habits or associations bore on the § 3553(a) factors, and it offered no rationale tethering those facts to the degree of the above-Guidelines sentence. *See Smith*, 440 F.3d at 707 (the statement of reasons must enable meaningful appellate review); *cf. United States v. Fidse*, 778 F.3d 477, 483 (5th Cir. 2015). Either way—departure without findings or variance without an adequate explanation—the sentence is procedurally unreasonable.

Nor has the Government carried its "heavy burden" to show harmless error. *United States v. Juarez*, 812 F.3d 432, 438 (5th Cir. 2016). It

must "prov[e] *beyond a reasonable doubt* that the error did not contribute to the sentence received." *Garza*, 448 F.3d at 301 (emphasis added). The Government argues that because the Statement of Reasons recites the same justification the court gave orally, the court would have imposed the same sentence regardless. That will not do. In *United States v. Ibarra-Luna*, we were "*convinced* that the explanation the district court gave for imposing an above-Guidelines sentence would have led it to do so even if it had considered the correct Guidelines range," yet we could not "state with the requisite certainty . . . that the district court would have imposed *precisely* the same sentence." 628 F.3d 712, 716 (5th Cir. 2010) (emphasis added). The same flaw is present here.

At bottom, the ambiguity between the oral pronouncement and the Statement of Reasons renders the basis for the sentence unclear. And "unclear or ambiguous sentences must be vacated and remanded for clarification in 'the interest of judicial economy and fairness to all concerned parties.'" *Garza*, 448 F.3d at 302 (quoting *United States v. Patrick Petroleum Corp.*, 703 F.2d 94, 98 (5th Cir. 1982)). Because the majority holds otherwise, I respectfully concur in part and dissent in part.